IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


CYNTHIA JONES,

        Plaintiff,

     v.                                    Civil Action No.5:07-CV-87


MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    Background

Plaintiff, Cynthia Jones, (Claimant), filed her Complaint on July 9, 2007 seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on October

2, 2007.[2]  Claimant filed her Motion for Summary Judgment on November 12, 2007.[3]

Commissioner filed his Motion for Summary Judgment on January 10, 2007.[4]  Claimant replied

to Commissioner's Motion on January 18, 2007.[5]

B.    The Pleadings

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 11.

[4] Docket No. 15.

[5] Docket No. 16.

1.      Plaintiff's Memorandum In Support of Motion for Summary Judgment.

2.      Defendant's Brief In Support of Motion for Summary Judgment.

3.      Plaintiff's Reply Brief.

C.      Recommendation

I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED because 1) any failure by the ALJ to include a push/pull limitation in the hypothetical to the VE was harmless error, because there is no evidence the jobs cited by the VE required Claimant to push or pull to any degree or beyond the limits set by Dr. Labatia; 2) the ALJ did not err by failing to obtain additional expert opinion on Claimant's mental RFC; and 3) the ALJ properly evaluated Claimant's statements of pain and discomfort.

2.      Commissioner's Motion for Summary Judgment be GRANTED for the same reasons set forth above.

## II. Facts

A.      Procedural History

Claimant filed an application for disability benefits and supplemental security income on June 23, 2004, alleging disability since June 4, 2004 due to numbness in her limbs, headaches, and a burning sensation.  (Tr. 86).  Her application was initially denied on November 4, 2004 and upon reconsideration on February 23, 2005.  Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing on April 20, 2006.  On May 30, 2006, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeals Council.  The Appeals Council denied review and Claimant filed this action, which proceeded as

set forth above.

B.     Personal History

Claimant was 39-years-old on the date of the April 20, 2006 hearing.  Claimant obtained

her high school diploma and has prior work experience as a rental clerk manager, medical data

entry clerk, receptionist, accounts receivable clerk, and medical assistant.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ

concluded Claimant was not under a disability: June 4, 2004 through May 30, 2006:

**West Virginia University Hospital, Inc., Dept. of Orthopedics, 9/22/94, (Tr. 155)**
Physical Examination: The patient continues to have full passive range of motion to the MP and
IP joints without much difficulty or discomfort.

**Dr. Gregg O'Malley, M.D., West Virginia University Hospital, Inc., Dept. of Orthopedics, 9/22/94, (Tr. 156)**
The patient is eight weeks now status post repair of a flexor tendon, Zone 5, as well as ulnar
nerve and artery.  The patient is improving.  She does not have full active flexion yet and still
has a flexion contracture, extrinsic in nature, as well some wrist stiffness, but she is going to
therapy regularly and this is improving.

Plan: At this point, we will discontinue the splint immobilization and get more aggressive with
passive stretching, avoid any strenuous lifting and gripping type activities for another month.
She is to return here in four weeks for follow-up.

**Timothy Hunt, M.D., West Virginia University Hospital, Inc., Dept. of Orthopedics, 9/8/94, (Tr. 157)**
Physical Examination: Out of her splint, she is indeed very stiff in regards to her fingers in the
above mentioned position.  Trying to determine the active firing of the flexor tendons was
difficult but they all appear to be working.  She states that she had good sensation in all of her
fingers.  She had a very stiff wrist today when we brought her up to neutral.

Impression: Six weeks status post above mentioned injuries with stiffness.

**West Virginia University Hospital, Inc., Dept. of Orthopedics, 9/11/94, (Tr. 159)**
Physical Examination: On physical examination, her wounds are well healed without any sign of
infection.  She could passively flex all of her fingers almost fully.  The split [sic] was intact.

**Impression**: Doing well, two weeks out following right numerous flexor tendon repairs and repair of a partial laceration to the median nerve.

**West Virginia University Hospital, Inc., Dept. of Orthopedics, 8/4/94, (Tr. 161)**
**Impression**: One week status post Zone 5 repair to FDS to the index, ring, and small fingers and repair of partial median nerve laceration, doing well.

**Premier Med Urgent Care, 7/30/04, (Tr. 165)**
Caught fingers in dog's collar.
**Assessment**: Left 5th finger strain.

**Ihab Y. Labatia, M.D., 9/20/04, (Tr. 166)**
**Assessment**: This is a very nice 38 YO lady with main complaints of upper and lower back pain, mostly lower back pain. She does have a history of severe left scoliosis. Her lower pain appears to be mechanical secondary to lumbar spondylosis due to facet joint syndrome.

**Recommendation**:
1) I recommend patient to be a light duty setting with no frequent lifting more than 10 lb and occasional lifting up to 20 lb.
2) No frequent pulling or pushing more than 10 lb, occasional pulling or pushing up to 20 lb.
3) I recommend against frequent bending, stooping, or twisting.

**Clarksburg Surgical Specialists, Inc., 9/9/04, (Tr. 173)**
**Impression/Plan**: Symptomatic cholelithiasis with umbilical and epigastric hernias. Will perform a laparoscopic cholecystectomy and do primary hernia repairs at that time.

**DDS Physician, 10/26/04, (Tr. 175)**
Physical Residual Functional Capacity Assessment
Exertional Limitations:
       Occasionally lift and/or carry: 50 lbs
       Frequently lift and/or carry: 25 lbs
       Stand and/or walk: about 6 hours in an 8-hour workday.
       Sit (with normal breaks): about 6 hours in an 8-hour workday.
       Push and/or pull: unlimited, other than as shown for lift and/or carry.
Postural Limitations: None established
Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations: None established; Claimant partially credible. Her daughter helps with chores. X ray shows severe scoliosis but ROM is ___.

**Affiliated Physical Therapy, 1/14/05, (Tr. 185)**
Observation: MRI revealed L convexity scoliosis apex at L3.

Assessment: Complaints have increased at the CS w/ mod tightness. Pt notes compliance with HEP as of late. Continued w/ heat / stim and manual CS stretch. Pt notes decreased symptoms at the hip.

**Affiliated Physical Therapy, 11/9/04 - 12/6/04, (Tr. 186-203)**
Assessment: INITIAL: Pt presents w/ pain associated w/ adaptive shortening of mm secondary to moderate TL scoliosis. MRI in near future. Tenderness is noted at R gr troch secondary to bursitis. Associated increased R iliac crest height is noted w/ decreased tolerance to end range LS / CS mvmts. R rib hump noted w/ associated R elevated scap. Pt did well w/ initiation of targeted flexibility and stabilization ex in pool followed by modalities per physician recommendations. Attempts will be made to increase soft tissue mobility in conjunction w/ stressed postural awareness ex. END INITIAL.

**DDS Physician, 2/2/05, (Tr. 208)**
Physical Residual Functional Capacity Assessment
Exertional Limitations:
      Occasionally lift and/or carry: 50 lbs
      Frequently lift and/or carry: 25 lbs
      Stand and/or walk: about 6 hours in an 8-hour workday.
      Sit (with normal breaks): about 6 hours in an 8-hour workday.
      Push and/or pull: unlimited, other than as shown for lift and/or carry.
Postural Limitations: None established
Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations: None established.
Additional Comments:
Claimant alleges severe scoliosis.
This is a recon case, initially reviewed by Dr. Lauderman. No new medical records in file to review. Physician office center returned request stating that there were no records for time period requested. We will look over records from initial case.
Lumbar X-ray from 8/04 shows severe scoliosis and degenerative changes. Physical exam from 9/17/04 shows that she has constant back pain that can radiate to the thighs. She has full ROM despite the scoliosis. All other joints show full ROM also. Neuro exam is intact.
Medications: Endocet
ADLS: She has help with cooking and laundry. She is independent with her personal case needs, she does state that sometimes her back will go out in the shower. She goes shopping twice monthly for appox 1 hour at a time. She appears to be partially credible as her exam was

basically normal with the exception that she does indeed have scoliosis.
CE Dr. States that she should not lift more than 10 pounds.  CE findings show that she could do at least medium work, findings do not support light RFC.

**Beverly Epstein, M.D., 2/9/05 (Tr. 216)**
Assessment/Plan:
1) Right SI dysfunction, resolved.
2) Right greater tronchanteric bursitis.
3) Sever Kyphoscoliosis.
4) Possible right L5-3 radiculopathy.

**Beverly Epstein, M.D., 11/18/04 (Tr. 218)**
Physical examination: Low back examination reveals decreased lordosis.  Flexion leads to right sided low back pain and bilateral hamstring pull as well as on occasion right lower extremity pain.  Extension leads to central low back pain. Lateral flexion to the right leads to right sided low back pain.  Lateral flexion to the left is negative.  There is a gibbous on the right with left thoracic and right thoracolumbar scoliosis. Long sitting test reveals that the right leg lengthens. The patient has tenderness at the right greater tronchanter and right SI joint on compression.

Assessment/Plan:
1) Right SI dysfunction.
2) Right greater tronchanteric bursitis.
3) Kyphoscoliosis, severe.
4) L1-2 and 2-3 severe right disk protrusion.

**Beverly Epstein, M.D., 10/27/04 (Tr. 221)**
Assessment/Plan:
1) Right SI dysfunction.
2) Right greater tronchanteric bursitis.
3) Kyphoscoliosis, severe. We will check scoliosis films.
4) Question of right l3-4 radiculopathy.  We will check an MRI and make sure that this is just discogenic and not a tumor.

**Jeffrey Carpenter, M.D., 11/12/04, (Tr. 226)**
Impression:
1) Levoscoliosis of the lumbosacral spine as described above with degenerative endplate changes and right neural foraminal stenosis at the L1-2 and L2-3 levels as described above.
2) No significant central canal stenosis is present at any level.

**Andrew Mace, M.D., 10/26/04, (Tr. 229)**
Impression: Scoliosis as above.

**Aroon Suansilppongse, M.D., DDS Physician, 2/18/05 (Tr. 230)**
Psychiatric Review Technique
Medical Dispositions:
      No medically determinable impairment.
      Coexisting nonmental impairment(s) that requires referral to another medical speciality.
Consultant's Notes: Claimant alleges depression on ADLS. This is a recon case, it was not
      reviewed on initial level. She is not on medication for depression and has not received
      any treatment for her depression. Per ADLS: she takes care of her children, prepares
      meals for them and does the shopping for household items. She is independent in her
      personal care needs. She states that she is depressed due to her physical limitations. She
      enjoys reading, watching TV and talking on the phone. She appears to be credible. It is
      not unreasonable to feel depression when your physical limitations prevent you from
      doing things you were once able to do. She does not appear to have any significant
      limitations due to her depression.
      MER does not document any psychopathology. Claimant's allegations are considered
not    totally credible.

**Dr. Michael Hess, M.D., 11/16/04, (Tr. 256)**
Her weight is up to twenty pounds. HEENT shows decreased affect, but otherwise within
normal limits. Heart is regular. Lungs are clear. Abdomen shows severe mid-epigastric
tenderness to deep palpation, but no hepatosplenomegaly and no guarding or rebound tenderness.
Extremities show continued severe scoliosis of the thoracic area of the spine. She has no
abnormal deep tendon reflexes. Psychologically, she has an almost tearful affect today.

**Dr. Michael Hess, M.D., 9/28/04, (Tr. 258)**
Her vital signs are stable. She is afebrile. Weight is down four pounds. HEENT is within
normal limits. Heart is regular. Lungs showed bilateral wheeze with a trace crackle, but no
consolidation. She has some central coarseness. Abdomen shows right upper quadrant
tenderness. Extremities show osteoarthritis changes, as well as severe scoliosis of the spine.
Neurological examination was performed and showed no evidence of peripheral neuropathy at
this point, only per history. She also has a history of temporomandibular joint, but is not having
any symptoms today.

**Dr. Michael Hess, M.D., 9/3/04, (Tr. 265)**
Her vital signs are stable. She is afibrile. HEENT is within normal limits. Heart is regular.
Lungs are clear. Abdomen shows right upper quadrant tenderness, but no guarding or rebound
tenderness. Extremities show severe scoliosis of the spine and some suspected right hip
osteoarthritis. She has a markedly decreased affect today.

**Dr. Michael Hess, M.D., 8/24/04, (Tr. 268)**
Assessment/Plan: 1) Cholelithiasis; 2) Scoliosis - worsening pain in back. Patient applying for

disability.

**Dr. Michael Hess, M.D., 8/6/04 - 4/4/05, (Tr. 275)**
Narrative Diagnosis
8/6/01 - Allergies
8/24/04 - Cholelithiasis/Scoliosis
9/03/04 - Scoliosis/Gall stones/ R hip
9/28/04 - Severe scoliosis/ ___/ Gall stones/ URI
11/16/04 - Severe scoliosis/Reflux/ Depression/Anxiety
12/9/04 - Depression/ Heartburn/ Dyspepsia/ Nic. Dep.
1/6/05 - Gastritis/ Severe scoliosis
4/5/05 - Depression/ Anxiety/___

**United Hospital Center, 9/4/04, (Tr. 282)**
Impression: No abnormality of the right hip is detected.

**United Hospital Center, 8/31/04, (Tr. 283)**
Impression: Severe scoliosis and degenerative changes.

**Jeffrey Carpenter, M.D., 9/25/05, (Tr. 293)**
Impression: Large right C5-C6 paracentral disk protrusion, which causes mass effect upon the central cord, with severe right-sided neural foraminal stenosis.

**Sanford Emery, M.D., 11/28/05 (Tr. 296)**
Objective: On physical exam, she is a well appearing female in no acute distress. She has a normal gait. She can toe walk. She has normal toe to heel tandem gait without spasticity. She is mildly tender in the C5 region. Extension is good to about 30 degrees. Flexion and rotation are full. On motor testing, she has no weakness that I can pick up. She is slightly dull to pinprick in the thumb and two radial digits bilaterally. Reflexes are 1 to 2+ and symmetric in the uppers and lowers. She has no pathological reflexes. Her shoulder exam shows her to be tender over the right rotator cuff. She has a positive impingement sign on the right, but not the left. She has a negative Tinel's at both wrists, but a positive Phalen's sign bilaterally at 30 seconds.

Assessment:
1) Cervical disk herniation C5-C6 with neck pain and +/- radiculopathy.
2) Right rotator cuff tendinitis.
3) Possible carpal tunnel syndrome.

**Beverly Epstein, M.D., 10/12/05, (Tr. 298)**
Objective: Physical examination. Neck flexion leads to upper extremity biceps pain. Extension is negative. Rotation and lateral flexion lead to central cervical pain. Deep tendon reflexes are

+2 throughout. Sensation: the patient complaints of decreased pinprick in both her feet. Gait within functional limits. The patient has a kyphoscoliosis.

Assessment:
1) C4-5 radiculopathy on the right with a disk protrusion causing some abnormal radicular pain and cord deformity. The patient will visit with the spine surgeon for this and her scoliosis as well as her lumbar spine problems.
2) Right S1 dysfunction.
3) Severe scoliosis.
4) Right L2-3 and L1-2 foraminal stenosis. The patient wants to try a pain clinic, and she was referred on to UHC for the second time. She will also try Topamax for neurogenic pain. She will start at 25 mg and increase by 25 mg twice a day until she gets to 100 mg twice a day. I am asking her primary care physician to refill 100 mg tablets b.i.d. if this medication should help her. If not, she can just stop. It is a low enough dose for her to stop. She will not be following with me anymore. She will follow with UHC pain clinic and be referred on to a spine surgeon.

**Beverly Epstein, M.D., 9/9/05, (Tr. 300)**
Assessment and Plan:
1) Right SI dysfunction. The patient was given another injection in the SI joint on the right in the office with Depo-Medrol 80 mg and 1 cc of lidocaine.
2) Severe scoliosis, the patient does not want any surgery.
3) Cervicalgia versus C4-5 radiculopathy. The patient is starting to get some radiating pain into the right biceps area. Would have her do an MRI on the cervical spine.
4) Right-sided L2-3 and L1-2 foraminal stenosis. The patient was will be referred to UHC pain clinic for possible nerve blocks at L2-3 first and if this is of no help at L1-2, the possible SI injection under fluroscopic guidance. I will see her back in the clinic after her MRI of the cervical spine and possibly all her care will be turned over to UHC spine center.
5) Insomnia secondary to pain and anxiety and depression. The patient states that she is on 300 mg of Wellbutrin. She cut down on smoking, but has not stopped. She is not sleeping well. I will see her back after the MRI and keep you informed.

**Beverly Epstein, M.D., 5/13/05, (Tr. 302)**
Assessment:
1) Right SI dysfunction.
2) Mild right greater trochanteric bursitis.
3) Severe kyphoscoliosis.
4) Right cervicalgia versus C4 radiculopathy.
5) Insomnia secondary to pain and anxiety.

**Andrew Mace, M.D., 11/28/05, (Tr. 304)**
Impression: Scoliosis as above.

**Dr. Michael Hess, M.D., 10/7/05, (Tr. 316)**
Assessment: 1) Severe scoliosis; 2) Depression; 3) Allergies.

D.    Testimonial Evidence

Testimony was taken at the April 20, 2006 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 368)

Q    You indicate that your onset date or the date that you became unable to work was

June 4th of 2004.  Is that correct?

A    Yes, ma'am.

Q    What happened on that date?  How did you become disabled on that date?

A    It had just gotten to the point that my pain was keeping me from my work.

Q    Have you worked since that time?

A    No.

Q    And tell me in your own words what is it that keeps you from being able to work

right now?

A    My pain.

Q    Tell me a little bit what that's like each day.  On a scale of one to ten, on a bad

day what's it like?

A    Ten.

Q    On a good day?

A    Six, seven.

Q        What do you do to relieve yourself on bad days?

A        Sometimes, sometimes there's nothing I can do.  I change positions.  I try heat.

Sometimes there's nothing I can do, but basically just changing positions and trying to get it to

go away.

                              *                *                *

Q        What about cleaning the house?

A        I have my children help me a lot.

Q        Do you take trips with the children or family members?

A        Not really anymore.  I just don't like riding in a car.  It's too hard on me for long

distances.

Q        Do you do laundry?

A        I have my daughter help me, but yeah.

Q        Visit with any family or friends?

A        Not lately.

Q        When was the last time?

A        I visited with my nieces last week.

Q        Do you do any of your own personal care, taking care of your hair, showering,

things like that?

A        Yes.

Q        Cooking?

A        Yes.

Q      Do you have any hobbies that keep you busy or pass the time?

A      I used to read.  I really can't still long enough, but I watch TV.

Q      Okay.  Any vacuuming?

A      Yeah, yes.

Q      Any activities or clubs outside the house such as any type community organizations, church, anything like that?

A      No.

Q      Do you play games with your children or family members or friends?

A      Yes.

Q      Can you carry your groceries in the house once you get home?

A      No.

Q      How do you get your groceries inside?

A      The children carry it in for me and put it away.

Q      Do you participate in any kind of exercise program or therapy or anything like that?

A      Yes.  I have exercises my doctor had given me to help relieve the pain or strengthen certain muscles.  I have some exercises I do.

Q      All right.  If you have to lift something there by your chair and carry it across the room, how much do you think you can lift and carry?

A      Ten pounds.

Q      Do you have any pets?

A      Yes.

Q    What do you have?

A    A dog.

Q    Do you care for it?

A    Again, I have my children help me.  She's too strong for me.

Q    How long can you stand without having to sit down?

A    Ten minutes.

Q    How far can you walk?

A    Not very far.  I never really, about ten minutes, if that.

Q    How long can you sit without having to stand up?

A    About 20 minutes.  It depends.

                        *                *                *

[EXAMINATION OF CLAIMANT BY REPRESENTATIVE]  (Tr. 378)

Q    Can you be exact about where this pain is located?

A    It's clear up and down my spine and the neck area, it just tingles all the time.  And in this area there is like a dull ache all the time and then, I don't know, it's just clear up and down it.

Q    Okay.  Does it stay centralized in the back and neck area, or does it radiate?

A    It radiates.

Q    Okay.  Where does it radiate to?

A    My arm.  Mostly the right side of my body, my arm and my leg.

Q    Okay.  How often do you have that radiating type pain?

A    Daily.

Q       Daily?  Okay.  Do you have any problems with muscle spasms?

A       Yes.

Q       Where do the spasms occur?

A       In my lower back.  Sometimes it will cause me to fall.

Q       Okay.  How often are you falling because of the spasms?

A       Well, I've been slowing down and being a lot more careful, but I still, once a

month probably.

Q       Okay.  How often are you getting the spasms?

A       Daily.

Q       Okay.  How long do they generally last?

A       All day.

Q       Now earlier in your testimony you said your pain at its worst level was a level

ten.

A       Yes.

Q       How often is it reaching a level ten?

A       Every day, a couple times a day.

Q       Okay.  For about a total of how many hours are you in that level ten pain per day?

A       Two to three.

Q       All right.  Do you ever have to lie down to relieve pain?

A       Yes.

Q       And again, how often are you lying down for pain relief and for how long?

A       It just depends again, but usually about an hour.  Sometimes I have to lay down

and stretch out, but it depends on the pain.

Q      Okay.  Now is that an hour per day, hour per week?

A      Hour per day.

                              *                *                *

Q      You mentioned problems with walking, sitting and standing.  What about other

postural positions such as bending?  Are you able to bend?

A      I try to make sure I bend with my legs.

Q      Okay.  What do you mean bend with your legs?

A      When you bend I bend my knees, not my back.

Q      Okay.  So you are like stooping or crouching down?

A      Yes.

Q      Okay.  Are you able to reach overhead or reach forward?

A      Yes.

Q      Okay.  And do you have any problems with the range of motion in your neck?

A      Yes.  I have a lot of trouble seeing sides.

Q      Side to side?

A      Yes.

Q      What about up and down?

A      It hurts.

Q      Okay.  Do you notice that pain affects your ability to concentrate or impairs your

memory in any way?

A      Both.

Q        Okay.  Could you give me some examples?

A        I'll be watching TV with my kids and I won't even see what's on the screen.  It's like  I'm not, they'll say did you see that.  I'm like no.  Sometimes I'm just in my own little world.

Q        Okay.  Now you're also being treated for depression.  It looks like you are on Wellbutrin.  Is the pain what's affecting your moods or other things?

A        It has a lot to do with it.  I think that's what caused the depression also because I'm unable to do what I used to be able to do.

Q        Okay.  Did you have, how long have you had a problem with depression?

A        Probably a lot longer than diagnosed, but a couple years now.

Q        Okay.  Do you have crying spells and mood swings?

A        Yeah.

Q        Okay.  How often do you have the crying spells?

A        They've been a lot more daily lately.

Q        Okay.

A        Sorry.

Q        That's okay.  That's okay.  How are you sleeping at night?

A        I don't sleep.  I get maybe two, three hours.

Q        All right.  Are you ever napping?

A        Yes.

Q        Okay.  For how often and how long do you nap?

A        I sleep for a couple hours after the kids go to school in the morning.

*      *      *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 386)

Q       Mr. Ganoe, would you please characterize the claimant's prior relevant work?

A       Work as a rental agent and exertional  level is sedentary.  Skill level is semiskilled.  Work as accounts receivable clerk, exertional level is sedentary.  Skill level is semiskilled.  And work as a medical level is semiskilled.

Q       All right.  If you assume a hypothetical person of the claimant's age, background, education and work experience, who can do a range of light work with occasional postural, no lifting more than ten pounds on a regular basis or 20 pounds occasionally.  No constant lifting above the head.  No constant motion or activity above the head.  No unprotected heights.  No hazardous machinery.  Sit/stand option and no food pedals.  Has a limited range of motion of the neck, especially from side to side.  With that hypothetical, could the person do the claimant's prior relevant work?

A       I feel the individual would be able to do the work as accounts receivable clerk, Your Honor.

Q       Does accounts receivable clerk have the option, a sit/stand option?

A       Usually they do, Your Honor, yes.

Q       Okay.  Are there any occupations in the light area that this type of individual can do?

A       Under the light exertional level a mail clerk, 202,000 nationally, 2,300 regionally.  A price marker, 319,000 nationally, 1,675 regionally.  And because the hypothetical includes a sit/stand option and no lifting in both, I've reduced those numbers in half, Your Honor.  Those

17

are a sampling, Your Honor.

Q        Okay.  If you added to the light level a low stress environment, by that I mean an entry level, unskilled, routine and repetitive, working with things as opposed to people, short, simple instructions, with all of the other limitations that I have given you, would that person be able to do any of the claimant's prior relevant work?

A        No, they would not be able to, Your Honor.

Q        Are there any other occupations in the economy that the person could perform?

A        The job listed as price marker would still be available, Your Honor.

Q        Okay.  Any others that would be available?

A        A parking lot attendant, Your Honor.  85,000 nationally, 1,000 regionally, and I'd reduce those numbers because the hypothetical includes sit/stand option.

Q        All right.  What about at the sedentary level?

A        Sedentary level, a general sorter.  25,000 nationally, 900 regionally.  An address or stuffer position, 240,000 nationally, 2,000 regionally.  A general production inspector, 87,000 nationally, 1,900 regionally.  Those are a sampling, Your Honor.

Q        All right.  If a person is off task up to ten percent of the time due to pain or lack of concentration, persistence of pace, would they be able to function in these jobs?

A        If they are off task more than ten percent of the time, yes, Your Honor, they would be able to.

Q        Okay.  If they are off task, greater than ten percent of the time due to any of those reasons they would not be able to function.

A        That's true, Your Honor.

Q        Is your testimony consistent with the <u>DOT</u>?

A        It is, Your Honor, except the <u>DOT</u> does not describe whether or not her job has a sit/stand option and it's based upon my experience in placing an individual.

*                    *                    *

E.        <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•        Wakes up and makes coffee.  (Tr. 129)

•        Prepares meals for her children, aged 12 and 16.  (Tr. 129)

•        Does laundry.  (Tr. 129)

•        Prepares meals including easy box meals or frozen dinners.  (Tr. 131)

•        Does cleaning and laundry, "all day" on a daily basis.  (Tr. 131)

•        Goes outside occasionally, as needed.  (Tr. 132)

•        Drives a car.  (Tr. 132)

•        Shops for groceries, cleaning supplies, and toiletries, twice a month for an hour each time.  (Tr. 132)

•        Pays bills, handles a savings account, counts change, uses a checkbook/money order. (Tr. 132)

•        Reads and watches television.  (Tr. 133)

•        Difficulty sitting more than 10 minutes.  (Tr. 133)

•        Talks on the phone with others, a couple of times a week.  (Tr. 133)

- Can walk for five minutes before needing to rest.  (Tr. 134)

- Can pay attention for 15-20 minutes.  (Tr. 134)

- Able to follow written and spoken instructions; gets along with authority figures.  (Tr. 134-35)

- Visits niece.  (Tr. 375)

- Vacuums.  (Tr. 375)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends the ALJ erred in step five of the sequential analysis because she failed to include a limitation in pushing and pulling in the hypothetical posed to the vocational expert, ["VE"].  Claimant also contends the ALJ erred in determining her mental RFC because she ALJ did not obtain the testimony of a medical advisor at the hearing or order a consultative psychological evaluation.  Finally, Claimant contends the ALJ  erred in evaluating the credibility of her statements of pain.

Commissioner responds the hypothetical posed to the VE was proper because it accounted for all Claimant's limitations to the extent they were credible and supported by the objective medical evidence.  Commissioner adds that even if the ALJ erred in failing to include a push/pull limitation in his hypothetical to the VE, the error was harmless because none of the jobs cited by the vocational expert had push/pull requirements.   Commissioner did not respond to Claimant's allegation regarding the ALJ's failure to obtain additional medical testimony or opinion regarding Claimant's mental RFC. Finally, Commissioner asserts the ALJ accurately determined Claimant's mental RFC.

B.    The Standards

1.      Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 569(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §§ 405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. §§ 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is

disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

1.    Whether the ALJ Posed an Improper Hypothetical to the VE.

Claimant contends the ALJ posed an improper hypothetical to the VE because the hypothetical failed to include a limitation on pushing and pulling. Commissioner argues the hypothetical was proper because it accounted for those limitations supported by the objective medical evidence. Commissioner adds that even if the ALJ erred by failing to include a push/pull limitation in the hypothetical, the error was harmless because the jobs cited by the VE did not have a push/pull requirement.

During step five of the sequential analysis, the ALJ is responsible for reasonably setting forth all of Claimant's impairments in the hypothetical posed to the VE. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); SSR 96-5p (1996). In other words, the hypothetical must "adequately reflect" a persons's impairments. Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005). However, the ALJ's hypothetical need only include those limitations supported by the

record.  Id.  The limitations and impairments included in the hypothetical should reflect the

Claimant's RFC.  20 C.F.R. § 404.1545; SSR 96-8p.

The ALJ in the present case determined Claimant retained the residual functional

capacity to perform:

> "work at the light exertional level[6] with certain modifications.  She must not be required
> to life more than ten pounds frequently, lift more than twenty pounds occasionally, or
> perform constant lifting above her head.  She may perform no pushing or pulling but may
> perform all posturals on an occasional basis.  She must have an allowance for limited
> range of motion of her neck from side to side and must not be required to operate foot
> pedals.  She must be allowed to sit and stand at will.  She must avoid hazards such as
> dangerous moving machinery and unprotected heights.  She is limited to unskilled, entry-
> level work that involves short, simply instructions and routine, repetitive tasks, primarily
> working with things rather than people."  (Tr. 22).

At the hearing, the ALJ posed the following hypothetical to the VE:

> "If you assume a hypothetical person of the claimant's age, background, education and
> work experience, who can do a range of light work with occasional postural, no lifting
> more than ten pounds on a regular basis or 20 pounds occasionally.  No constant lifting
> above the head.  No constant motion or activity above the head.  No unprotected heights.
> No hazardous machinery.  Sit/stand option and no foot pedals.  Has a limited range of
> motion of the neck, especially from side to side.  With that hypothetical, could the person
> do the claimant's prior relevant work?"  (Tr. 387).

In response to the hypothetical, the VE responded the hypothetical person would be able

to do claimant's prior work as an accounts receivable clerk and light work as a mail clerk and

price marker.  (Tr. 387).  The ALJ then inquired of the VE, "[i]f you added to the light level a

low stress environment, by that I mean an entry level, unskilled, routine and repetitive, working

with things as opposed to people, short, simple instructions, with all the other limitations that I

---

[6] Light work requires lifting no more than 20 pounds at a time occasionally and 10
pounds frequently.  20 C.F.R. §§ 404.1567(b), 416.967(b).  Light work also involves a good deal
of walking or standing or sitting most of the time with some pushing and pulling of arm or leg
controls.  Id.

have given you, . . . [a]re there any other occupations in the economy that the person could perform?" (Tr. 386-87). The VE responded the hypothetical person would be able to perform the jobs of price marker, parking lot attendant, general sorter, and general production inspector. (Tr. 388).

The Court finds that the ALJ's failure to mention any push/pull limitations in the hypothetical was error, but constitutes harmless error. First, substantial evidence does not support the ALJ's inclusion in Claimant's RFC of a complete limitation on pushing and pulling. Accordingly, it was not error for the hypothetical to the VE to omit reference to a complete limitation on pushing and pulling from the hypothetical. However, because Dr. Labatia concluded Claimant could not push or pull more than 10 pounds frequently and 20 pounds occasionally, and because the ALJ previously credited Dr. Labatia's report over the reports by Drs. Lauderman and Pascasio, the ALJ had a duty to, minimally, explain why she failed to include a push/pull limitation in the hypothetical to the VE. See Gordon, 725 F.2d at 235-36 {ALJ must document consideration of all relevant evidence.]. Her failure to do so constitutes error, but her error was harmless because there is no evidence the inclusion of a push/pull limitation in the hypothetical to the VE would have resulted in a different finding by the ALJ regarding the availability of jobs in the national economy. See Mickles v. Shalala, 29, F.3d 918, 921 (4th Cir. 1994) [holding remand is not necessary, despite ALJ's initial error, where ALJ would have reached same result notwithstanding his error.]. The Court so finds because there is no indication in the job descriptions provided by Claimant that Claimant would be required to push or pull to any degree or beyond the limits set by Dr. Labatia.

Accordingly, it is recommended relief be denied.

2.  <u>Whether the ALJ Erred by Failing to Obtain Additional Testimony or Opinion On Claimant's Mental RFC</u>.

Claimant contends the ALJ failed to comply with her duty pursuant to SSR 96-6p to secure the testimony of a medical advisor at the hearing or a consultative psychological evaluation to accurately determine Claimant's mental RFC. Specifically, Claimant contends the ALJ, in finding Claimant's anxiety and depression were severe impairments, implicitly found there existed evidence that could have changed the opinion of Dr. Suansilppongse - a state agency psychiatrist who concluded in February 2005 Claimant did not suffer from any medically determinable mental impairments - and therefore had a duty to secure the opinion of a mental health professional before determining Claimant's mental RFC. (Tr. 230). Commissioner did not reply to this specific issue.

SSR 96-6p provides, "an Administrative Law Judge . . . must obtain an updated medical opinion from a medical expert in the following circumstances: when additional medical evidence is received that in the opinion of the Administrative Law Judge or the Appeals Council may change the state agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the listing of impairments." SSR 96-6p.

The Court finds the ALJ did not err by failing to obtain further opinion on Claimant's mental RFC because the evidence relied on by the ALJ in determining Claimant's RFC consisted of evidence that was either available to Dr. Suansilppongse in February 2005 or not of the nature likely to change Dr. Suansilppongse's opinion. Specifically, the records dated after Dr. Suansilppongse evaluation consisted of continued complaints from Claimant of crying, anxiety, and depression and did not otherwise document such a change in Claimant's mental functioning such that the ALJ had a duty pursuant to SSR 96-6p to obtain additional medical testimony or

26

evaluation.

Accordingly, it is recommended relief be denied.

3.      Whether the ALJ Erred In Evaluating the Credibility of Claimant's Statements of Pain.

Claimant contends the ALJ erred in evaluating the credibility of the statements of her pain.  Specifically, she alleges the ALJ improperly engaged in "sit and squirm" jurisprudence by evaluating the legitimacy of her complaints of pain and discomfort by merely observing her body language at the hearing.  Commissioner alleges the ALJ complied with the two-part test set forth in Craig, 76 F.3d at 592-93, in concluding Claimant's claims of disabling pain were not entirely credible.

Craig, 76 F. 3d 585, sets forth the two-step process for evaluating the credibility of subjective symptoms such as pain.  Under Craig, 76 F.3d at 592-93, the ALJ must first determine whether there exists a medically determinable impairment capable of causing the symptoms alleged.  Id. at 594.  If the claimant makes this showing, the ALJ must next evaluate the intensity and persistence of the symptoms and the degree to which they impact the claimant's work-related abilities.  Id. at 595.  The evaluation in the second prong must consider the claimant's own statements about pain as well as objective medical evidence in the record.  The claimant's own statements need not be credited to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.

The Court finds the ALJ complied with Craig when she concluded "claimant's medically determinable impairments could reasonably be expected to produce the alleged

symptoms," but "claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." (Tr. 23). In compliance with the first prong of <u>Craig</u>, the ALJ considered the medical evidence and found Claimant's medical impairments, including her scoliosis and cervical disk disease, were capable of causing her pain. (Tr. 22-26). In compliance with the second prong of <u>Craig</u>, the ALJ then considered the extent to which the medical evidence and Claimant's lifestyle evidence supported the degree of pain and discomfort alleged by Claimant. In finding there was weak support for Claimant's allegations of pain, the ALJ reasonably relied on the absence of medical opinion Claimant was disabled, and testimony Claimant retained the ability to prepare meals, clean the house, do laundry, shop, and vacuum. (Tr. 26, 31-32, 375). Although the ALJ did conclude Claimant's body language at the hearing appeared inconsistent with the degree of pain and limitation alleged by Claimant, (Tr. 26), such conclusion was not the sole or primary basis for the ALJ's limited credit of Claimant's statements of pain.

Accordingly, it is recommended relief be denied.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED because 1) any failure by the ALJ to include a push/pull limitation in the hypothetical to the VE was harmless error, because there is no evidence the jobs cited by the VE required Claimant to push or pull to any degree and beyond the limits set by Dr. Labatia; 2) the ALJ did not err by failing to obtain additional expert opinion on Claimant's mental RFC; and 3) the ALJ properly evaluated Claimant's statements of pain and discomfort.

2. Commissioner's Motion for Summary Judgment be GRANTED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after the date of this Order, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: March 26, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE